## STATE v. GRAMM ET AL.

Official Bonds — Bond of State Treasurer — Liability for Loss of Public Money Deposited in Banks without Negligence on the Part of the Treasurer.

1. In the statute requiring the State treasurer at the expiration of his term of office to deliver to his successor all balances of funds which may be in his possession, the phrase "balances of funds in his possession," applies to, and means, all such funds, which he has received, and has not lawfully paid out,

or for which he is not entitled to any credit legally, or equitably, and for which he is bound in law to respond.

2.  The statutory provision that the State treasurer "shall receive and keep all moneys of the State not expressly required by law to be received and kept by some other person," with respect to the degree of care to be exercised in keeping the money, means that the treasurer shall keep it according to law.

3.  The State treasurer is not an insurer of the absolute safety of the public funds coming into his hands. He is not liable under the statutes or his bond for moneys lost without any fault or negligence on his part, and where there has not been a lack of skill, diligence, or faithfulness.

4.  The condition of a bond given by the State treasurer was as follows: "Now, therefore, if the above bounden Otto Gramm shall and will truly and justly account for all the moneys coming into his hands by virtue of his said office as treasurer of the State of Wyoming, and shall faithfully and truly perform all the duties of his said office, then this obligation to be void, otherwise the same shall remain in full force and effect." The statute required a bond conditioned that the officer will truly and justly account for all moneys coming into his hands by virtue of his office, and also provided that the treasurer, "shall receive and keep all moneys of the State not expressly required by law to be received and kept by some other person," and that at the expiration of his term of office he should deliver to his successor "all balances of funds in his possession." It was the uninterrupted custom existing for eighteen years, known to the officers and inhabitants of the Territory and State, for the treasurer of the Territory and State to deposit the State funds in a bank for safe keeping, no other safe place being provided therefor. Without negligence or unfaithfulness the treasurer deposited certain State funds in a private bank located at the State capital, said funds being deposited in his name as treasurer, and payable upon his check and order as treasurer, and kept separate and distinct from his private funds. He was not negligent or in any degree at fault in depositing and retaining the moneys in said bank. The banker was of excellent character and repute as a banker, and was entirely safe and solvent until the day when he made an assignment for creditors. Suddenly, solely by reason of a sudden, great, and unprecedented panic in the community, the banker became insolvent, and assigned his property for the benefit of creditors. In making settlement

with his successor the treasurer made full reports of his said
deposits, and turned over the vouchers therefor. Suit was
brought upon the treasurer's bond for the money so deposited
and lost in said bank. *Held*, that the duty imposed upon the
treasurer by the statute and all reasonable implications there-
from was that he should have the custody of the money of the
State, and should exercise a diligent and prudent care over
the money, but in a high degree, and should also bring to the
performance of such duty strict fidelity and faithfulness; and
that under the bond no greater responsibility was assumed by
the treasurer and his sureties. *Held further*, that under the
bond and statutes the treasurer was not an absolute insurer of
the safe keeping of the moneys coming into his hands, and
upon the facts in the case, as above set forth, the treasurer
being in no degree at fault, or negligent, and the money hav-
ing been lost without fault or negligence, or lack of skill on
his part, the treasurer and his sureties are not liable upon the
bond sued on for the money lost as aforesaid.

Corn, J. dissenting.

5. In case the treasurer and his sureties were liable upon the
bond for money lost while on deposit in the bank, neither the
fact that the State brought suit to trace the funds into the
hands of the assignee of the banker, and to recover them as
trust funds, and did recover a portion, nor the fact that the
State had accepted dividends from the banker's insolvent
estate, would constitute an estoppel against the State from
pursuing the treasurer upon his bond, since the money
belonged to the State, and no efforts of the State to recover it
could affect the liability of the treasurer for any unrecovered
balance.

[Decided March 1, 1898.]

Reserved questions from the District Court for Lara-
mie County, Hon. Charles W. Bramel, Judge of the
Second District, presiding.

This case was submitted to the district court upon the
motions of plaintiff and defendants respectively for judg-
ment upon the pleadings. The suit is brought in the
name of and by the State upon the bond given by Otto
Gramm, as State treasurer, on the 4th day of July, 1893,
with Henry G. Balch, Daniel C. Bacon, William C.
Wilson, Jr., Francis E. Warren, and Thomas A. Kent as

sureties. The material allegations of the petition are substantially as follows: That said Otto Gramm was elected to the office of State treasurer, on the 11th day of September, 1890, for a term ending on the 7th day of January, 1895; that he entered upon the discharge of the duties of such office on the 7th day of November, 1890, and continuously acted as such officer until January 7, 1895, at which time he was succeeded by Henry G. Hay. He had given a bond upon first assuming the duties of the office, but owing to the death of two of his sureties he gave the bond in suit upon the requirement of the secretary of state; the bond was duly approved. That during his term of office said Gramm had received the sum of $44,147.31, which it was his duty to pay over to his successor, but he had failed to make such payment. Judgment is claimed for said amount with interest. All of the defendants except William C. Wilson, Jr., who, it is presumed, was not served with process, appeared and filed an answer admitting the election of said Gramm to the office aforesaid, his entering upon, and continuance in, the discharge of the duties thereof, the execution and approval of the bond; but denying that on January 7, 1895, or at any time thereafter, said Gramm had in his possession the sum of money mentioned in the petition, or any other sum of money belonging to plaintiff, unless the money thereinafter shown to have been deposited in bank be held to have been at that time in his possession. The answer also specifically denies the making of any default in payment to the successor of said Gramm, unless the facts thereinafter set forth constitute such default, and denies the truth of the charge that he did not truly and justly account for all moneys that came into his hands as such treasurer, and alleges that he did honestly, truly, and justly account for all moneys that came into his hands, as such officer, at any time after the giving of the bond sued on. The answer further denies that there was any duty of his office which said Gramm did not faithfully, truly, and justly perform.

The answer then continues with the following which we quote: "And these defendants aver that on the 20th day of July, A. D. 1893, and for many years prior thereto, one Thomas A. Kent was engaged in the general banking business, in the city of Cheyenne, in the county of Laramie, and State of Wyoming, and was of excellent repute and financial standing as a banker in said city of Cheyenne, and throughout the State of Wyoming; that at divers times prior to the said 20th day of July, A. D., 1893, the said Otto Gramm as treasurer of the State of Wyoming, did deposit with and entrust and deliver to the said Thomas A. Kent, doing business as T. A. Kent, banker, as aforesaid, divers sums of money, in the aggregate many thousands of dollars, which said sums of money were of the public funds of the said State of Wyoming, and were in the possession of said Otto Gramm as State treasurer as aforesaid, and were as aforesaid deposited in the said bank conducted by the said Thomas A. Kent, banker, and that at the respective times when each and all of said sums of money were as aforesaid deposited with said Thomas A. Kent, banker, the said public funds and moneys were known by the said banker to be public moneys of the State of Wyoming, and were by him received and held subject to the check and order of the said Otto Gramm as State treasurer, of the State of Wyoming, all of the said deposits being made in the name of Otto Gramm, State treasurer, and being kept entirely separate and distinct from any private funds of the said Otto Gramm, and being so as aforesaid deposited to the sole use and benefit of the said State of Wyoming."

"And defendants aver that on the said 20th day of July, A. D. 1893, solely by reason of a great, sudden, unusual, unprecedented, and entirely unlooked for business panic in the community in which the said Thomas A. Kent was doing business as a banker, the said Thomas A. Kent suddenly became insolvent and executed a deed of assignment under the laws of the State of Wyoming, wherein and whereby he assigned to one Joel Ware

Foster for the benefit of the creditors of the said Thomas A. Kent, all of his property, including any and all money so as aforesaid, in his hands belonging to the State of Wyoming, and deposited with him by the said Otto Gramm as State treasurer of the State of Wyoming. That the amount of such State funds in his hands at the time of the assignment was fifty-six thousand, four hundred and fifty-four dollars and seventy cents ($56,-454.70)."

"And defendants further aver that for a period of at least eighteen years prior to the assignment of the said Thomas A. Kent, it was the common and uninterrupted custom in the Territory of Wyoming and in the State of Wyoming for the treasurer of the said Territory and State to deposit the public funds belonging to the said Territory and to the said State in banks subject to check of the treasurer thereof, which said custom has at all times been generally known to the citizens of the State of Wyoming and of the Territory of Wyoming, and to the officers thereof. That the said custom was a reasonable one and was necessary for the safe keeping of the funds belonging to the State of Wyoming and belonging to the said Territory of Wyoming. That there was no other way whereby the funds belonging to the State or to the Territory could be as safely and securely kept as by depositing the same in the manner aforesaid. All of which was at all times well known to the said Territory of Wyoming, and to the officers thereof, and to the said State of Wyoming, and to the officers and inhabitants thereof, who with such full knowledge at all times, failed and refused to provide any safe or secure place for keeping the said funds, and at all times acquiesced in the actions of the said treasurers and of the said defendant, Otto Gramm, in depositing said funds in bank, according to the custom aforesaid."

"And defendants aver that the insolvency of the said Thomas A. Kent, banker, was wholly unknown to the said Otto Gramm, or to these defendants, or to the community in which he carried on his business, until the

execution of the said assignment, and that the said insolvency was wholly unanticipated until he made his assignment as aforesaid. That in truth and in fact the said Kent, banker, would not have become insolvent but for the sudden, great, and unusual panic which occurred at that time in the community where he carried on his business as a banker; that the property and assets of the said Thomas A. Kent, at the time of the said assignment, were such as to have much more than paid all of his debts and liabilities at the values which said property possessed immediately prior to said assignment, which values said property and assets had maintained for many years prior to said assignment.''

'' And defendants aver that the said Otto Gramm was not in any degree negligent, nor in any degree unfaithful to his trust as treasurer of the State of Wyoming; nor in any degree at fault in depositing or retaining said moneys or any of them in the said bank, and that the money so deposited in said bank are the moneys which the plaintiff seeks to recover in this action.''

'' And defendants aver that the said Gramm was not in any degree at fault or in any degree negligent, or in any degree lacking in skill, or in any degree unfaithful in the care, custody, or safe keeping of said moneys or any of them. That no negligence of the said defendant Otto Gramm in any degree, that no unfaithfulness of the said defendant Otto Gramm in any degree, caused, or in any way contributed to the loss of said funds, or any of them.''

It is further alleged that in January, 1894, the State brought its action for said moneys against the assignee for the benefit of creditors of said Thomas A. Kent; and that the State by authority of the Legislature elected to and did receive dividends from said assigned estate amounting to $12,307.39.

The plaintiff filed a reply admitting the lack of negligence or fault on the part of the officer, the reply in that respect being as follows:

"Comes now the above named plaintiff, the State of Wyoming, and for its reply to the answer of the defendants in said cause, admits that on the 20th day of July, A. D. 1893, and for many years prior thereto, one Thomas A. Kent was engaged in the general banking business in the city of Cheyenne, in the county of Laramie, and State of Wyoming, and was of excellent repute and financial standing as a banker in said city of Cheyenne, and throughout the State of Wyoming; that at divers times prior to the said 20th day of July, A. D. 1893, the said Otto Gramm as treasurer of the State of Wyoming, did deposit with the said Thomas A. Kent, banker, many thousands of dollars of the public funds of the said State of Wyoming, which said public funds were known by the said Thomas A. Kent, banker, to be public moneys of the State of Wyoming, and which were by him received and held subject to the check and order of the said Otto Gramm as State treasurer of the State of Wyoming, and were kept entirely separate and distinct from the private funds of the said Otto Gramm."

"And plaintiff further admits that on the 20th day of July, A. D. 1893, by reason of a business panic in the community in which the said Thomas A. Kent was doing business as a banker, the said Thomas A. Kent suddenly became insolvent and executed a deed of assignment under the laws of the State of Wyoming to one Joel Ware Foster of all of his property including all moneys in his hands belonging to the said State of Wyoming, said money amounting to the sum of fifty-six thousand four hundred fifty-four dollars and seventy cents ($56,454.70)."

"And plaintiff further admits that for a period of at least eighteen years prior to the assignment of the said Thomas A. Kent, it was the common and uninterrupted custom in the Territory of Wyoming and in the State of Wyoming for the treasurers of the said Territory and State to deposit the public funds belonging to said Territory and State in banks subject to check of the treasurer thereof, which said custom has at all times been generally known

to the citizens of the State of Wyoming and of the Territory of Wyoming, and to the officers thereof, and the said State of Wyoming and its officers and inhabitants had failed to provide any other place for keeping said funds."

"And plaintiff further admits that the insolvency of the said Thomas A. Kent was wholly unknown to the said Otto Gramm, or to either of said defendants, or to the community in which he carried on his business until the execution of the said assignment, and that the said insolvency was wholly unanticipated until he made his assignment as aforesaid, and that the property and assets of the said Thomas A. Kent, at the time of the said assignment were such as to have much more than paid all of his debts and liabilities at the values which said property possessed immediately prior to said assignment, which values said property and assets had maintained for many years prior to said assignment."

" Plaintiff further admits that the said Otto Gramm was not in any degree negligent, nor in any degree unfaithful to his trust as treasurer of the State of Wyoming, nor in any degree at fault in depositing or retaining said moneys, or any of them in the said bank, and that no negligence or unfaithfulness on the part of the said defendant, Otto Gramm, in any degree caused or contributed to the loss of the said funds by the failure of said bank."

The allegations of the answer concerning the pursuit of the money in the hands of Kent's assignee, and the receipt of dividends by authority of a legislative resolution, is also admitted. It appears by such reply that the amount of money in the hands of the officer which had been deposited in said bank, and were there at the time of the assignment was $56,454.70, and that the sum sued for is the balance after deducting the amount recovered from the assignee by the suit against him, and by way of dividends.

Upon the submission of the motions for judgment upon the pleadings the district court reserved the following

questions held to be important and difficult to this court
for its decision thereon.

*First.*  Under the bond set out with the petition are
the defendants liable for losses of State funds by the State
treasurer, Otto Gramm, which occurred without any neg-
ligence or unfaithfulness in any degree on the part of said
State Treasurer in any way relating to his trust as
treasurer?

*Second.*  Under the bond sued on if the facts are that
for eighteen years prior to the loss hereinafter set forth, it
had been the uninterrupted custom, known to the officers
and inhabitants of Wyoming, for the defendant, Otto
Gramm, as State treasurer, and his predecessors in office,
to deposit the funds of Wyoming in bank, as was done in
this instance, and if with this knowledge the officers and
inhabitants of Wyoming, had failed to provide any other
place for keeping said funds.  And if without any negli-
gence or unfaithfulness to his trust in any degree, on the
part of said Otto Gramm as State treasurer, he deposited
fifty-six thousand four hundred fifty-four dollars and sev-
enty cents ($56,454.70) of the funds of the State in T. A.
Kent's bank, as the State funds payable upon the check
and order of himself as State treasurer, and kept entirely
separate from the private funds of said Otto Gramm.
And if said Otto Gramm, as State treasurer, was not in
any degree at fault in depositing or retaining moneys in
said bank.  And if said banker was of excellent charac-
ter and repute as a banker at the city where he did busi-
ness as a banker and was entirely safe and solvent until
the day of his assignment.  And if suddenly, and solely
by reason of a sudden, great, and unprecedented, and un-
expected financial panic in the community where he did
business, the said banker became suddenly insolvent and
assigned his property, including the funds of the State in
his hands.  And if said Otto Gramm, as State treasurer,
in accounting with his successor for the funds in his hands
made full report of the deposits made by him as aforesaid
and turned over to his said successor the vouchers there-

for. And if the State of Wyoming upon said vouchers, and under express authority of a resolution of the legislative assembly of the State of Wyoming filed its claim with the assignee of said banker, claiming as its own the said moneys, fifty-six thousand four hundred fifty-four dollars and seventy cents ($56,454.70), so deposited with the said banker by said Otto Gramm as State Treasurer, and thereafter received from said assignee as dividends upon said claim the sum of twelve thousand three hundred seven dollars and thirty-four cents ($12,307.34). Would the defendants under and by reason of these facts be liable upon the bond sued on?

*Third.* Under the bond sued on did the. defendants become insurers of the funds of the State of Wyoming, placed in the hands of Otto Gramm, as State treasurer, and liable, in all events, for any loss that might occur of any such funds?

*Fourth.* Under the pleadings should judgment go, and if so, should it be for the plaintiff or for the defendants?

*Benjamin F. Fowler*, Attorney-General, for plaintiff.

The claim on the part of Otto Gramm, that as State treasurer, he deposited certain of his funds in the banking house of Thomas A. Kent, and that on account of its being a reputable, reliable banking house, and that his act of depositing was in accordance with the custom which had prevailed in this State for many years, is not a proper justification, in view of the statute which provides that he must keep all moneys to be turned over to his successor at the expiration of his term of office. ` (Const., Art. 3, Sec. 40; Art. 6, Sec. 20; Art. 15, Sec. 7; Rev. Stat., Secs. 1631, 1687, 1696.)

The weight of authority overwhelmingly sustains our contention that Otto Gramm and his bondsmen are liable for the full amount of the deficiency, and that their obligation is equivalent to an insurance on their part that the funds of the State would be paid over to his successor in office. (Fairchild v. Hedges, 44 Pac., 125 (Wash.);

Board v. Jewell, 44 Minn., 427; Wilson v. Wichita
County, 67 Tex., 647; Gartley v. People (Colo.), 49
Pac., 272; Rose v. Douglass Tp., 52 Kan., 451; Nason
v. Directors, 126 Pa. St., 225; Ward v. School Dist., 10
Neb., 294; U. S. v. Prescott, 3 How., 578; U. S. v.
Morgan, 11 How., 154; United States v. Dashiel, 4
Wal., 182; U. S. v. Keehler, 9 Wal, 83; Boyden v.
U. S., 13 Wal., 17; Bevans v. U. S., 13 Wal., 56;
State v. Nevin, 19 Nev., 162; Halbert v. State, 22
Ind., 125; Rock v. Stinger, 36 Ind., 346; The State ex
rel. Miss. Co. v. Moore, 74 Mo., 413; State v. Powell,
67 Mo., 396; Inhabitants of Hancock v. Hazard, 12
Cush., 112; Dist. Township of Taylor v. Morton, 37
Iowa, 550; County of Hennepin v. Jones, 18 Minn.,
182; New Providence v. Mc Eachran, 33 N. J. L., 339;
Muzzy v. Shattuck, 1 Denio, 233; Com. v. Conely, 3
Pa. St., 372; State v. Harper, 6 O. St., 607; 4 Ency. L.
680 (2d ed.); Mechem on Pub. Off., Par. 300;
Com'rs v. Lineberger, 3 Mont., 231; Tillinghast v.
Merrill, 151 N. Y., 135; Bailey v. Com. (Pa), 10
Atl., 764; Nason v. Directors, 126 Pa. St., 445; Griffin
v. Board (Miss.), 15 So., 107; Thompson v. Board, 30
Ill., 99; U. S. v. Watts, 1 New Mex., 562.)

The former action by the State to recover the money
from Kent's assignee, and the acceptance of dividends
can not affect the right of recovery in this action. The
money belonged to the State, and it could sue to recover
it. (Rowley v. Fair, 104 Ind., 189; Mc Clure v. Board
(Colo.), 34 Pac., 765; Sauer v. Town, 14 Colo., 54; State
v. Foster, 5 Wyo., 199; State v. Mc Fetridge, 64 Wis.,
130.) The treasurer and his sureties are allowed credit
for the amount recovered, and they have no cause for
complaint.

*Van Orsdel & Burdick*, and *John W. Lacey*, for
defendants.

The provision in official bonds for an accounting is
satisfied by an honest and truthful account, either produc-

ing the funds or furnishing lawful excuse for their non-production. See New Providence v. Mc Eachran, 33 N. J. L., 339. The condition to "faithfully discharge the duties" stipulates for the fidelity and honesty of the treasurer. (R. R. Co. v. Cowles, 69 N. C., 59; Minor v. Bank, 1 Pet., 46; Bank v. Adams, 12 Pick, 303; Bank v. Clossey, 10 Johns, 271; Bank v. Ten Eyck, 48 N. Y., 305; Ry. Co. v. Bartlett, 120 Ill., 603.) Receivers, under similar bonds are not insurers of the funds in their hands. (Barton's Ex. v. Ridgeway's Admr., 23 S. E., 226; Hamm v. Stone (Tex.), 35 S. W., 427; Powers v. Larghbridge, 38 N. J., 396.) Executors and administrators are required by law to give bond, under which they are generally required to account. It is universally held that they are not insurers. (Moore v. Eure, 101 N. C., 11; Lehman v. Robertson, 84 Ala., 489; Townsend v. Meagher, 44 Mo., 356; Foster v. Davis, 46 Mo., 268; Newton v. Bushong, 22 Grat. (Va.), 628; In re Maxwell's Estate, 3 N. Y. Supp., 422; In re Kohler's Estate (Wash.), 47 Pac., 30.

Guardians, although required to give bond, and hedged about by statutory requirements as strict as the terms of the statute and bond in the case at bar, are not held to be insurers. (Fahenstock's appeal, 104 Pa. St., 46; In re Law's Estate, 144 Pa. St., 499; Witmer's Appeal, 87 id., 120; Neff's Appeal, 57 id., 91; Beach v. Mosier (Kan.), 46 Pac., 202; O'Connor v. Decker (Wis.), 70 N. W., 286.) It certainly ought to be true that the rule of equity and common sense found just and equitable between man and man should still hold when the controversy is between the citizen and the public.

The United States cases cited by counsel are still further weakened by the fact that the rule announced in U. S. v. Prescott, which he cites as the leading case, and which is the leading case in favor of the plaintiff, has been found too harsh to be either just or productive of the best results, and therefore Congress has passed a statute providing for the allowance of claims of government

officials for losses sustained by them without fault or negligence on their part, thus restoring the law to the same status as in the case of other trustees, and making the rights of the public on such bonds none other than would be the rights of a citizen in case of similar bond given in his favor. (14 U. S. Statutes at Large, 44.) The common law rule was different from that laid down in the Prescott case. See U. S. v. Thomas, 15 Wall., 337. Neither the statutes here nor the bond sued on indicate any intention to change the rule from that confessedly in force at the common law. There is no legislative indication of a public policy in hostility to the rule at common law, which is the rule of common sense. (Walker v. Guarantee Asso'n, 18 Ad. & El., 277; Bank v. Hallowell, 52 Me., 545; Cumberland v. Pennell, 69 Me., 357; Thompson v. White, 45 Me., 444.) The case of Cumberland v. Pennell denies the proposition that the treasurer is an insurer, and refuses assent to that doctrine. The following also deny the liability of a public treasurer for money lost without fault on his part. (State v. Houston, 78 Ala., 576; Peck v. James, 3 Head., 75; State v. Copeland (Tenn.), 34 S. W., 427; York County v. Watson, 15 S. C., 1; City of Healdsburg v. Mulligan (Cal.), 45 Pac., 337; Livingstone v. Woods (Mont.), 49 Pac., 437 (overruling Comrs. v. Lineberger, 3 Mont., 231); Mechem on Pub. Off., 301.)

Upon the contention that the State was estopped by the pursuit of the money as a trust fund and the acceptance of dividends, counsel urged that the State has the right to one remedy but not to both; and that a *cestui que trust* can not have judgment against his trustee and at the same time have lands purchased with the trust funds adjudged to be trust property and cited. (Barker v. Barker, 14 Wis., 142; Fears v. Lynch, 28 Ga., 249; Merket v. Smith, 33 Kan., 66; Fowler v. Bank, 113 N. Y., 450; 3 Hurls. & Colt., 977; 7 App. Cas. L. R., 345; 4 Johns., 469; 3 Johns., Ch. 416; 18 N. Y., 552; 22 N. Y., 327; 34 N. Y., 473; 46 N. Y., 354; 95 N. Y., 237; 9 Bos., 246;

5 Hun, 556; 36 Hun, 513; 103 N. Y., 669; 10 Q. B. (L. R.), 57; 7 Ex. (L. R.), 26; 2 Metc., 319; 4 Allen, 339; 71 N. Y., 348; 87 N. Y., 166.)

POTTER, CHIEF JUSTICE.

[After stating the facts as above]    The facts admitted by the pleadings, and stated in the reserved questions, raise the general question whether the State Treasurer, under our statutes relating to that officer, and the bond given by him, is liable for public funds in his possession, which have been lost by reason of the failure of a bank in which he had deposited them for safe keeping, he being without any fault, blame, or negligence.    The reputable character of the bank in the community and among business men, and its excellent reputation for solvency, and safety as a place of deposit, is admitted, as well as that the the treasurer was not negligent or careless in depositing or leaving the public funds in such bank.    While thus acquitting the late officer of all blame, it is urged on the part of the State by the attorney-general that the treasurer and his sureties under the statutes and the bond, are insurers of the safety of the public money coming into the custody of the officer, and that, notwithstanding that he has been honest, faithful, and capable in the discharge of his duties, and the moneys have been lost in the absence of any kind of fault on his part, they must respond for all such moneys. The contrary rule is contended for on behalf of defendants.

The matter has been fully and ably presented to the court on both sides, both in briefs and upon argument. The decisions of the courts in this country upon this question present an irreconcilable conflict.    It is one of first impression in this court.    We have examined all the authorities with much care and have arrived at a conclusion only after mature reflection.    We realize the importance of the question, so far as the present case is concerned. ˙ It is a matter, however, which, for the future can and ought to be clearly settled by legislation.

In the process of determining the principle which

must govern a decision upon the question before us, and the application of the various conflicting authorities, to it, it will be useful in the first place to set down certain well-established rules upon which all the courts are in accord. The point of divergence will, thus, be the more observable and the better understood.

1. In general, all trustees who have the custody of money, such as executors and administrators, guardians and receivers and the like, are held not to be liable for the loss of funds occurring without their fault or negligence, and this is so, regardless of the form or character of the bond which they may have given, or the statutes or orders of court prescribing their duties. Such trustees are held merely to diligence and prudence in the care of the funds. The rule is stated as follows in 2 Story Eq. Jur., Sec. 1269: "The rule in all cases of this sort, is, that when a trustee acts by other hands, either from necessity or conformably to the common usage of mankind, he is not made answerable for losses." He is to keep the money as a prudent man would keep his own. Norwood v. Harness, 98 Ind., 134, 140. In this case; on page 144, the court say, "His business is to keep the money *safely* and banks are commonly used as safe places of deposit by prudent men." Notwithstanding that his duty "is to keep the money safely," an administrator was held not liable for money lost by the failure of a bank in which it had been deposited without negligence. Twitty v. Houser, 7 S. C., 153; Jacobus v. Jacobus, 37 N. J. Eq., 17; Cox v. Roome, 38 id., 259; Deberry v. Tory, 2 Jones Eq. (N. C.), 370; Mc Cabe v. Fowler, 84 N. Y., 314; State ex rel. v. Meagher, 44 Mo., 359.

In the case last cited the suit was brought upon the bond of an administrator which was conditioned, that he should pay over and account for the money or property that should come to his hands belonging to the estate, as required by law. It was said that "it is well established equity law that, under certain circumstances, executors and administrators are absolved from responsibility, not-

withstanding the bond, and notwithstanding the failure to produce the property or pay over its value in money." * * * "No negligence being imputable to the administrator or executor. (2 Williams on Ex., 142 and cases cited.) The obligation of the bond, therefore, in such cases is not absolute." In determining what was "required by law," referring to that phrase in the bond, the court did not resort to any exception found either in the bond or statute, but went to the common law, and as a result of an investigation on that line, determined, "that executors and administrators, according to the decided cases and views of eminent law writers, stand in the position of trustees of the persons who are interested in the estates which they administer, and that they are subject to liability only for want of due care and skill, and that the measure of care and skill required of them is the same as that demanded of bailees for hire, namely, that which prudent men exercise in the direction of their affairs." The cases upon this particular branch of the subject abound in expressions to the effect that such a person having trust money in his possession would be negligent if he did not deposit the same in a bank, as that is the place where the most prudent men deposit for safe keeping their own money, and in some instances such trustees have been held liable for the loss of money on the ground that they were negligent in failing to deposit it in bank. See also Powers v. Loughbridge, 38 N. J. Eq., 396; Moore v. Eure, 101 N. C., 11; Lehman v. Robertson, 84 Ala., 489; Foster v. Davis, 46 Mo., 268; In re Kohler's Est. (Wash.), 47 Pac., 30; In re Law's Est., 144 Pa. St., 499; Fahrenstock's App., 104 Pa. St., 46; Jones v. Lewis, 2 Ves. Sr., 240; Knight v. Plymouth, 3 Atk., 480.

2. It is also well settled that there is nothing at common law which distinguishes public treasurers or depositaries from any other financial managers or trustees.

3. The absence of any such distinction is recognized in another well-settled doctrine that public officers having in

their official custody money belonging to others than the public, are not responsible for its loss occurring without negligence on their part. That rule has been adopted in this country in cases where the officer and his sureties have been sought to be charged in suits upon the official bond. Wilson v. People, 19 Colo., 199; People ex rel. v. Faulkner, 107 N. Y., 477.

In the case of Wilson v. People *supra*, action was brought upon the official bond of a clerk of the district court, to recover certain moneys which had been deposited with that officer in condemnation proceedings. The money had been deposited by the clerk, to his credit as clerk, in a bank which subsequently failed. The bond was conditioned that the officer shall "faithfully perform all the duties of said office as prescribed by law, that he will punctually pay over to the person legally authorized to receive the same, all moneys that may come into his hands by virtue of said office," etc. The court was unanimous in absolving the officer and his sureties from liability, no negligence being imputable to him. The opinion in the case does not attempt to draw any distinction between cases of public and private funds, but in a subsequent case in the same court which will be hereinafter cited, such a distinction was made, although over the dissent of the writer of the opinion in the Wilson case, Mr. Justice Goddard. It will be observed that the condition of the bond above quoted was about as strong, if not entirely so, as in any of the cases holding the officer as to public funds to a strict accountability.

In the case of People ex rel. v. Faulkner, the Court of Appeals, of New York, refused to hold the obligation of the bond of a surrogate as absolute and as rendering himself and sureties liable as insurers of money belonging to others than the public, in his official custody, and lost without his fault by the failure of a bank in which it had been deposited. The material conditions of the surrogate's bond were as follows : "Well and truly faithfully in all things perform his duties as county judge of Livingston

County, and shall well and truly and faithfully perform his duties as surrogate of said county of Livingston, and shall well and faithfully apply and pay over all moneys and effects that may come into his hands as such county judge in the execution of his office, and shall well and faithfully apply and pay over all moneys and effects that may come into his hands as such surrogate in the execution of his office without fraud, deceit, or delay."

With this much, which may be considered as settled law, upon which the decisions are apparently not in conflict, we come to the precise question of the liability of public officers for public funds ; and here we are confronted with divergent views, and it is difficult even to reconcile all the authorities which reach the conclusion that such an officer as to such funds is an insurer and bound to respond in any event, with the possible exception of loss occasioned by the act of God or the public enemy.    In the consideration of this case, we have endeavored to extract the principle from the decisions favoring that strict and absolute rule and note the effect of the application thereof to our own statutes and the bond, which is the basis of the present controversy.    If, when so applied, such authorities, if followed by us, would render the treasurer and his sureties insurers of the public funds, a further investigation may become necessary to determine whether or not they or the opposing decisions announce to rule more agreeable to our conditions.

The first case involving this question in this country, arose in New York, Supervisors v. Dorr, 25 Wend., 438, decided in 1841, wherein it was held that a county treasurer was not responsible for public money stolen from his office where there is no imputation of negligence or other default on his part.    This case, however, has ceased to be an authority, for the reason that in People v. Faulkner supra, the Court of Appeals announced that owing to its having often been criticised, and in view of another case next to be adverted to, the question should be considered an open one in that State, although it was denied that it

had been at all overruled, and for the further reason that in a more recent case, the contrary doctrine had been adopted in that State.

Muzzy v. Shattuck, 1 Denio, 233, arising in the same State, was a case involving the responsibility of a tax collector for moneys collected by him and stolen from his possession without any fault, want of care, or omission of duty on his part. He was held responsible, but solely upon the ground that, under the statutes, that officer was a debtor for all the money collected, which, of course, meant that upon the collection of any tax money the legal title thereto was in him, and it was not the money of the public, but the officer became *eo instanti* a debtor for the amount, and the statute had provided the only method by which such obligation could be discharged. In passing, it may be said that the courts have not usually accepted that view, and this court announced a different view in the case of State v. Foster.

The cases which are based upon a holding that the officer is a debtor for the public funds in his possession, must be eliminated from this case as precedents.

The leading case upholding the doctrine that the treasurer occupies the position of an insurer, and on the strength of which the most, if not all of the cases, have adopted that rule of decision is U. S. v. Prescott, 3 How. (U. S.), 578, which was decided at the December term, 1844. Not all the courts, however, nor the same court in later decisions, which have followed that case and cited it approvingly, have kept to the fundamental principle underlying it.

It was an action brought upon the official bond of Prescott given for his faithful performance of the duties of receiver of public moneys at Chicago. The defense pleaded was that the sum not paid over had been feloniously stolen from his possession, notwithstanding that he had used ordinary care and diligence in keeping the same. A demurrer was filed to the plea, and thereon the opinion of the judges were opposed, and the case was certified to

the Supreme Court upon the question whether "the felonious taking and carrying away the public moneys in the custody of a receiver of public moneys, without any fault or negligence on his part, discharged him and his sureties." On the part of defendants it was contended before that court that the officer was a depositary for hire; and that unless his liability was enlarged by the special contract to keep safely, he is only subject to the liabilities imposed by law upon such a depositary; and that the special contract did not enlarge his liability. In response apparently to that point, the learned justice delivering the opinion, said, "This is not a case of bailment, and consequently the law of bailment does not apply to it. The liability of the defendant Prescott arises out of his official bond and principles which are founded upon public policy." Without quoting in full the condition of the bond, it will answer all purposes by calling attention to the fact that it required the officer to well, truly, and faithfully keep safely, without loaning or using, all the public moneys coming into his possession, and when orders for their transfer or payment had been received that he should faithfully and promptly make the same as directed. After quoting the bond, the opinion proceeds as follows: "The condition of the bond has been broken, as the defendant, Prescott, failed to pay over the money received by him when required to do so; and the question is, whether he shall be exonerated from the condition of the bond, on the ground that the money had been stolen from him. The objection to this defense is, that it is not within the condition of the bond and this would seem to be conclusive." And again, "Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open a door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange

his proofs, so as to establish his loss without laches on his part. Let such a principle be applied to our post-masters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public." It was held that the defense was not good.

It is evident from the most casual reading of the opinion just quoted from so largely, that, as concerned that action, all idea of a bailment was eliminated from the case. The matter of public policy was not brought in as an attachment to any common law rules relating to bailment. It was not said or held either expressly or by implication, that the common law principles affecting the responsibility of bailees for hire, as applied to depositaries of public funds, needed to be modified and made more strict. The court distinctly started out upon the theory that no question of bailment was involved; and placed whatever liability there existed squarely and solely upon the bond. It having been determined by the learned court that the bond out of which arose the only liability to respond, contained a positive agreement to keep all moneys received safely, and to pay them out or transfer them promptly whenever directed to do so, concluded that public policy forbade any relaxation by the courts of that condition. And further than that, the only reason given for the existence of that public policy was the opportunity for fraud which would be offered, were such defenses permitted, and the chance which an officer would have to manufacture a case of loss without fault. It must be remembered that this was the first case announcing that doctrine.

The next case, in point of time, Muzzy v. Shattuck, supra, has already been commented upon. Following that came Commonwealth v. Comly, 3 Pa. St., 372, decided at the July term, 1846, by the Pennsylvania Supreme Court, which involved the liability, under his bond of a collector of tolls, the condition thereof being that, "he shall account for and pay over all moneys he

may receive for tolls." The defense was a larceny of the moneys received for tolls from a secret apartment in a locked desk in the collector's office. The trial court had instructed the jury that if the collector had kept the public money as a prudent man would keep his own, and exercised that care and diligence which every person of common prudence takes of his own affairs, and if the money was actually stolen as sworn to, then the verdict should be for the defendant. The opinion of the court, delivered by Mr. Chief Justice Gibson, commences by citing the decision in the case of U. S. v. Prescott, and stating that the same is founded in sound policy and sound law, and the learned justice said, "The responsibility of a public receiver is determined not by the law of bailment, which is called in to supply the place of a special agreement where there is none, but by the condition of his bond." And, concerning the matter of public policy, "the keepers of the public moneys, or their sponsors, are to be held strictly to the contract, for if they were to be let off on shallow pretenses, delinquencies, which are fearfully frequent already, would be incessant."

In 1853, the case of Inhabitants of Hancock v. Hazzard, 12 Cush., 112, was decided by the Supreme Judicial Court of Massachusetts. The action was on the bond of the treasurer and collector of the town of Hancock. The defense in this case was that the unpaid money had been stolen without fault of the collector. In a former case, Colerain v. Bell, 9 Metc., 499, it had been said with reference to such an officer, under the peculiar provisions of the statutes, that the money received by him as collector, in the collection of taxes, is his own money and not that of the town. That case was referred to in the case reported in 12 Cushing, and the court said, "He is a debtor, and accountant, bound to account for and pay over the money he has collected. The loss of his money therefore, by theft or otherwise, is no excuse for non-performance. This is founded on the nature of his contract and considerations of public policy," and citing U. S. v. Pres-

cott. The court also said that the obligation is not regulated by the law of bailments. It is not difficult to understand that, if the officer is a debtor, no law of bailment is involved. It does, however, require something of an effort to understand what considerations of public policy, and the case of U. S. v. Prescott had to do with the case, if the officer was a debtor before he lost the money, unless indeed the Massachusetts court construed the decision in the Prescott case as making out that the money in Prescott's hands was his own. At any rate the case from Massachusetts is not in any sense a precedent for us under our statutes.

On this side of the judicial controversy the next case arose in Ohio, State v. Harper, 6 O. St., 698, decided in 1856. Harper had been county treasurer, and his bond contained the following condition: "Harper shall honestly and faithfully pay over, during his continuance in office, all moneys that shall come into his hands for State, county, and township, or for other purposes, according to law." His residence was broken open and certain public moneys stolen therefrom without his fault or negligence. Under the terms of the bond and the statute, it was held that the treasurer was an insurer "against the delinquencies of himself, and against the faults and wrongs of others in regard to the trust placed in his hands." The cases of Muzzy v. Shattuck which were based upon the theory that the officer was a debtor, and the Prescott case and Com. v. Comly, supra, based upon a different consideration, were strangely enough cited in support of the court's conclusion without comment. The court adds, "The distinction between this and a common case of bailment, is that the law of the latter is generally founded upon the absence of any positive engagement between the parties to the hiring, or as it is called, the *locatio-conductio*, and therefore the question arises, what obligation may, with reference to public policy and general convenience, be implied by law in the absence of such positive engagements. The express contract of the parties may, as in the case

now under consideration, it has done, vary or supersede those derived from the law of bailments."

A critical examination of some of the early cases can not fail to impress one with the thought that they observed no distinction between moneys, the legal title to which is by law vested in the officer, and those which are merely in official custody and care, but belong to the public and the various decisions which respectively base their conclusions upon one condition of affairs or the other are cited indiscriminately, as bearing upon and forming a precedent upon the same proposition. This is particularly noticeable in the Indiana cases, when read together. We can readily understand a court which, as in the Prescott case, has found a special contract which defines the obligation of the officer, and upon that ground enforces it, and refuses any equitable relaxation of the obligation for reasons of public policy, but it must be confessed it is embarrassing to determine the exact reason behind an opinion which approves and follows that doctrine, and, at the same time, finds support for its conclusions in another case which is founded upon the theory that the money is in the possession of the officer as a debtor. Both kinds of cases have, it is true, held the officer liable under his bond, but the reasons are far different, and in more recent times, when it has been necessary for the public to seek after its money in the hands of others to whom the officer has intrusted it, the distinction between a debtor and a mere custodian or keeper has become very marked. I do not regard the Ohio case, above referred to, as imputing the character of debtor to the treasurer, but as holding that the special contract has fixed the extent of his responsibility. The case of Halbert v. State, 22 Ind., 125, may not be based upon the debtor theory, although the learned justice who wrote the opinion, said in Rock v. Stinger, 36 Ind., 346, that it followed that the officer not being a mere bailee, the technical title to the money in his hands was in himself, and in case of his death, it would go to his personal representative rather than to his executor.

And, indeed, in still another case it was directly held that the title to the money was in the officer.

It is, therefore, at least doubtful whether the conclusion of the Indiana court was not influenced to some extent by that theory. In Halbert v. State, supra, decided in 1864, the strict liability was enforced, as well as in the later case of Rock v. Stinger, supra, and under statutes and bonds not as positive in respect to an engagement to keep safely and pay over as any of the other cases previously cited herein.

We have thus rather minutely discussed the foregoing decisions for reasons which will become obvious, and from necessity, as it seemed to us, even at the expense of extending this opinion beyond ordinarily reasonable limits, to the end that we might arrive at some satisfactory and exact knowledge of the reasons upon which the doctrine of the majority of the cases upon the subject have been grounded. With the cases above adverted to as leading precedents quite a number of the State courts have more recently announced the same doctrine. Many adopt the rule by mere reference to authority and with no attempt at argument. See Fairchild v. Hedges (Wash.), 44 Pac., 125; Board v. Jewell, 44 Minn., 427; County of Hennepin v. Jones, 18 Minn., 182; Wilson v. Wichita County, 67 Tex., 647; Gartley v. People (Colo.), 49 Pac., 272; Rose v. Douglas Co., 52 Kan., 451; Nason v. Directors, etc., 126 Pa. St., 445; State v. Nevin, 19 Nev., 162; Dist. Twp. v. Norton, 37 Ia., 550; Tillinghast v. Merrill, 151 N. Y., 135; Thompson v. Board, etc., 30 Ill., 99; State ex rel. v. Moore, 74 Mo., 413; State v. Powell, 67 Mo., 396; Bailey v. Com. (Pa.), 10 Atl., 764; Bush v. Johnson Co., 48 Neb., 1.

The doctrine announced in such comprehensive terms by the Prescott case has, however, been considerably modified in a later case in the same court. The Prescott case was followed by that court in Boyden v. U. S., 13 Wall., 171; Bevans v. U. S., id., 56; U. S. v. Morgan, 11 How., 154; U. S. v. Dashiel, 4 Wall., 182;

U. S. v. Keehler, 9 Wall., 83.   The United States cases
following the Prescott case make one matter clear; viz.,
that the officer is a bailee, but under special obligations.
It was said in the opinion in Bevans v. U. S. supra,
"Bailee, he was undoubtedly, but by his .bond he had
insured the safe keeping and prompt payment of the pub-
lic money which came to his hands."   And it is further
on in the opinion stated that the officer had not only
assumed the common law obligations of a bailee, but had
given bond to keep safely the money in his hands.

The case which modified to some extent the rule stated
in the Prescott and subsequent cases in the United States
Supreme Court above cited, is U. S. v. Thomas, 15
Wall., 337.   The direct result of this case was to exon-
erate a bonded government officer for the loss of public
moneys, occurring by the act of the public enemy, and
the bond, however stringent in its terms, was held not
absolute if performance of its conditions should be pre-
vented by the act of God or the public enemy, without
any neglect or fault on the officer's part.   The real effect
of this case has been much disputed.   It has been thought
by some to have practically overruled the former deci-
sions, but one of the able judges, Mr. Justice Miller, dis-
sented from the majority opinion because it did not flatly
overrule the Prescott and subsequent cases.   That distin-
guished jurist in a dissenting opinion of much clearness
and vigor, stated that he had not believed, and did not
then believe that there was any principle of public policy
recognized by the courts, or imposed by law, which made
a depositary of the public money liable for it, when it
had been lost or destroyed without any fault of negligence
or fraud on his own part, and when he had faithfully dis-
charged his duty in regard to its custody and safe keep-
ing.   This opinion, although written by a dissenting
judge, has been approved and followed by a respectable
number of the State courts since then, and its utterances
strongly approved by many other judges who have found
themselves obliged, for the like reasons as therein ex-

pressed, to dissent from the views of the majority of their court.

Whatever may be said of the majority opinion in the Thomas case, it is entirely manifest, and open to no possible contradiction, that it was necessary and so held, to modify the general expressions contained in the opinion in the Prescott case. The learned justice who delivered the opinion in the Thomas case, Mr. Justice Bradley, in discussing the duties and responsibilities of a public financial officer, said, "The general rule of official obligation, as imposed by law, is that the officer shall perform the duties of his office honestly, faithfully, and to the best of his ability. This is the substance of all official oaths. In ordinary cases, to expect more would deter upright and responsible men from taking office. This is substantially the rule by which the common law measures the responsibility of those whose official duties require of them to have the custody of property public or private. If, in any case, a more stringent obligation is desirable, it must be prescribed by statute, or exacted by express stipulation." To this general rule so clearly stated, we think no well-considered case has offered opposition. The learned justice then goes on to show that the basis of the common law rule is founded on the doctrine of bailment. That the public officer with property in his official possession is a bailee; and that the rules growing out of that relation must govern, unless the Legislature, at its pleasure, shall change the common law rule of responsibility, and proceeding, said, "Where, however, a statute merely prescribes the duties of the officer, as that he shall safely keep money or property received or collected, and shall pay it over when called upon to do so by the proper authority, it can not without more, be regarded as enlarging or in any way affecting the degree of his responsibility. The mere prescription of duties has nothing to do with the question as to what shall constitute the rule of responsibility in the discharge of those duties, or a legal excuse for the non-performance of them, or a discharge from their

obligation. The common law, which is common reason, prescribes that; and statutes, in subordination to their terms, are to be construed agreeably to the rules of the common law.'' After referring to the solicitude shown by Congress for due and faithful discharge of duties by public officials which is found indicated by statutes requiring officers to keep safely, without using or loaning, or depositing in banks, etc., all public moneys in their hands, and the exacting of a bond to a like effect, the opinion proceeds to state in substance that the officers are yet nothing but bailees, but that they are subject to special obligations, and the ordinary law of bailment can not be invoked to determine the degree of their responsibility, but that is fixed by special contract. While I do not regard the case just discussed as deciding anything more than that under the most stringent of statutes and bonds, the officer would be absolved from liability for losses caused by an overruling necessity, yet it does seem to me that the relation which an officer bears to the money in his hands, and the manner in which the extent of his responsibility is to be measured, is clearly stated; and I am of the opinion that no court at this day holds or would hold as generally as the Prescott case seems to do to the effect that the officer would be liable at all events, and that no circumstances of any character whatever could exonerate him.

So far we have adverted only to those cases which adopt the rule of strict liability. As has been indicated, the courts of this country are by no means in accord upon this proposition. The courts of last resort in a few of the States have refused to accede to the idea that there exists any rational distinction between the measure of the responsibility of an officer with public funds, and one having private moneys in his control, or any bonded trustee upon whom is imposed the duty of keeping money belonging to others. The existence of a public policy forbidding any relaxation of the condition of a bond given by the public official, when there has been no sort of negligence or fraud on his part, is strenuously controverted by

such courts, as well, especially in more recent cases, by a respectable number of dissenting judges. I shall not attempt more than a very brief citation and reference to the cases maintaining a view opposed to the Prescott case and those following it. They are Cumberland v. Pennell, 69 Maine, 357; State v. Houston, 78 Ala., 576; Peck, Trustee, etc., v. James, 3 Head (Tenn.), 75; State v. Copeland, 96 Tenn., 296, decided in 1895; York County v. Watson, 15 S. C., 1; City of Healdsburg v. Mulligan, 113 Cal., 205, decided in 1896; City of Livingston v. Woods (Mont.), 49 Pac., 437, the latter case overruling a former decision in that State.

The Alabama case was one involving a loss of public moneys caused by their being stolen, but in a more recent case in that State, Alston v. State, 92 Ala., 124, a probate judge was held liable for a loss of money occasioned by the failure of a bank, but upon the sole ground that the officer had no authority to deposit the money in a bank, and his unlawful act constituted him a debtor for the money so deposited.

The opinion in the case of Cumberland v. Pennell, supra, is very able and logical. The authorities are fully commented upon, and the Prescott case among others are reviewed, and the court says, "Notwithstanding the high character of the several courts whose decisions are above cited, we can not yield our convictions as to the construction to be given to the bond in such case, or concur in relation to the new-born public policy, based upon supposed facility or temptation, which depositaries of public money are said to possess, for collusive robberies, 'For,' as was said by Redfield, judge, in Bridges v. Perry, 14 Vt., 262, 'we can not believe that they are founded upon any just warrant, either of sound judgment or constant experience,' * * * 'on the contrary, this is the first case in this State in which the shallow pretense of robbery without fault on his part, has been interposed by a treasurer in action upon his official bond. Ever since the decision of Potter v. Titcomb, 7 Maine, 302,

the people of this State have entertained a different view from that promulgated for the first time in U. S. v. Prescott, as to the effect of an official bond stipulating for a faithful discharge of official duties.    In the case last cited, Mellen, chief justice, said:  "The design of all official bonds is to secure from losses those who are, or may be, interested in the faithful discharge of the duties mentioned in them.    Such bonds are given to protect against damage occasioned by unfaithfulness, negligence, or dishonesty in such officers."    And again,  "Were the law otherwise in this State, and known to be such, faithfulness and honesty, even if they continued to be considered commendable personal qualities, would be held, if not mere abstractions, matters of secondary importance at best in candidates.    Such qualifications, accompanied by the highest capability, would, in the absence of sufficient property in the principal to secure his sureties, fail to obtain them; for many a responsible person would gladly sign a bond as surety, guaranteeing the faithfulness, honesty, and capacity of his neighbor which were so potent in effecting his election to the responsible public station of county treasurer, who would long hesitate to insure the public against possible loss happening in spite of such qualities; for to insure against such a loss is not only vouching for the integrity of the officer, but practically for that of the rest of mankind — that they will not rob him."    The fact should be mentioned, that, after the earlier decisions by the Supreme Court of the United States, on this subject, Congress passed a law, authorizing the court of claims to hear and determine and afford relief in cases of all claims of a disbursing officer for relief, where a loss had occurred without fault or negligence on his part; thus offsetting in a large degree, as to federal officers, the harshness of the rule promulgated by the courts.    And it may be said, perhaps justly, as indicating congressional disbelief in the public policy discovered by the court.    And in Indiana and Ohio, the Legislature in some instances enacted special laws to

relieve public officials who claimed to have suffered loss in the absence of neglect. Mount v. State, 90 Ind., 29; Board v. Mc Landsborough, 36, O. St., 227.

The other cases which agree with the Maine court contain opinions giving evidence of much research and ability, and in all cases fully exploiting their reasons for refusing adherence to the doctrine that the treasurer and his sureties upon the bond are insurers.

Should it become necessary for this court, at any time, to determine which line of decisions to follow, I am constrained to confess that, at present, it seems to me the weight of authority can hardly be said, upon this question, to be settled by the preponderance of the number of courts advocating or adopting either view, but that it is a sufficiently open subject to require one's judgment to be formed only upon that line of reasoning which shall commend itself as possessing the most wisdom, and comporting with what is the most just, taking into careful consideration the enlightened public policy, and the individual rights of its citizens. Of the more recent cases upon the broad proposition, Montana, California, and Tennessee have followed in the footsteps of ¦Maine; and Colorado, Washington, and Nebraska have adopted the theory of strict responsibility.

With reference to the matter of public policy the California court in the case cited supra, uses the following language: ''It is urged in many of the cases which hold the officer to an absolute responsibility for all moneys coming to his hands, that if robbery or larceny were held to be a defense, it would endanger the security of public funds, and encourage simulated robberies and pretended larcenies. But we can not assume that courts of justice are unable to protect the public in such cases; and even if they could not do so, in all cases, justice does not require that the public shall be protected by enforcing against its servant, the officer, and his sureties, a liability the law has not imposed on them, and which they have not assumed.''

In the opinion of the majority of the court, however, this case does not require our assent to, or dissent from, the cases enforcing the more liberal rule. We express no opinion upon the general proposition. In our judgment, the important question is whether under the principle announced in the Prescott case, and those others which intelligently follow it, there is any such liability upon the bond sued on in this action as is contended for. We are inclined to believe that a few of the courts in attempting to apply the theory of absolute responsibility have perverted the original doctrine, while apparently enforcing it. We should hesitate to fall into a similar error. For that reason we have discussed the cases lying at the foundation of the rule, that we might be able to intelligently state the principle upon which the decisions rest. That principle is, that although the officer is a bailee, he has entered into a contract with sureties positively engaging to do something. The bond may fully express that engagement, or it may be aided by the statutes which prescribe the duties agreed to be performed. Finding a positive and solemn agreement, subject to no exception stated in the bond or statutes, to distinguish between a bond in such case, and bonds in other cases to which reference has been made, the courts resort to the matter of public policy which they hold requires that the absolute agreement or condition shall not be relaxed by any consideration of care or faithfulness, honesty, or skill, which may have been displayed by the officer. That public policy is held to arise, and only to arise, out of the possibility of fraud and simulated defenses, which public depositaries and their sureties could and would interpose, if any defense of lack of negligence or fraud on the officer's part is to be permitted. As was stated in an earlier part of this opinion, public policy is not invoked to alter any law of bailment. It does not act upon the common law obligations of a bailee, but is effectual only to keep the official strictly and absolutely to his bond, and the conditions thereof. It is universally recognized and

so stated in Boyden v. U. S. supra, that virtute officii, the officer is not an insurer, but he may make himself so when he enters into a solemn obligation by contract.

Such an obligation has been found to exist in bonds and under statutes, supplemented by bond, which requires the depositary of public funds to keep them safely, or to pay over to his successor, or to some other officer, all moneys which he shall have officially received, or to pay over all moneys belonging to his office, or language of similar, but as strong import. In the case of a collector of taxes whose duty it is to pay all money which he collects to some general depositary, and his bond requires that he shall pay over all the money which he shall collect or receive in his official capacity. In the case of a treasurer who is required by statute or bond or both to keep safely all the money coming into his hands, or if that provision is lacking, or it may be present, he is required to pay to his successor all moneys belonging to his office. It is held that the condition of the bond in either event would be broken, if the officer did not in fact pay over all moneys officially received by him, or did not keep the funds safely, or had failed to pay over all the money belonging to his office, as the case might be. The latter requirement is in the bond or statute in the Missouri, Colorado, and some other cases. It is obvious, therefore, that, primarily, our inquiry should be directed to the condition of the bond; to the positive engagement which these parties have entered into. No court has held that where the condition of the bond is that the officer will prudently and diligently keep the money he is an insurer, but it has been held that such a condition does not make the officer an insurer.

The fact alone that a bond is given is not sufficient. No well-considered case so holds, with the possible exception of the case of Tillinghast v. Merrill, 151 N. Y. From a reading of the statutes concerned in that decision, together with the decision itself, it might appear that no attention was given to the bond, and that the statute did

not impose upon the officer any positive and clear duty to do either of the things above mentioned; yet we observe, by reference to the statutes of that State, that the bond was required to be conditioned that the officer should keep safely all moneys coming into his hands.    I can not believe that the learned court overlooked the bond, and paid no attention to it, as it must have been before it.    In that case it was conceded by the court, as it has been in very many of the cases, that the rule of absolute liability is a harsh one, and shocks one's idea of justice, and that it is capable of working much hardship upon the individual.    But, the court said, in substance, that right there public policy came in, and as a general guard against fraud, and simulated defenses, demanded that the court enforce the rule that depositaries of public funds and their sureties are insurers of the absolute safety of the moneys in the official care.    That case, admittedly, was decided without any regard to former adjudicated cases outside of New York.

We come now to a consideration of the condition of the bond in suit, and what will constitute a breach thereof. Have the parties entered into a certain positive engagement from which, under the decisions maintaining the rule of strict responsibility, they can not be exonerated for losses occurring without the fault or negligence of the principal in the bond?

The condition of the bond, in suit, is as follows: "Now, therefore, if the above bounden Otto Gramm shall and will truly and justly account for all the moneys coming into his hands by virtue of his said office as treasurer of the State of Wyoming, and shall faithfully and truly perform all the duties of his said office, then this obligation shall be void, otherwise the same shall remain in full force and effect."

The bond is required by Section 1687, Rev. Stat., as follows:    "The territorial (State) treasurer shall give bond to the Territory (State) of Wyoming, in the penal sum of not less than seventy-five thousand dollars, conditioned that he will truly and justly account for all moneys coming

into his hands by virtue of his office." The additional
provision embodied in the bond that the treasurer "shall
faithfully and truly perform all the duties of his said
office" is not made a statutory part of the condition, but
as the other condition must be construed, we do not think,
with respect to the breach alleged in this action, the afore-
said supplemental condition adds anything to the obliga-
tion of the contract. The undoubted meaning of the
condition to "truly and justly account for all moneys" is
that he shall account therefor according to law, and,
in respect to such an accounting for moneys, it operates
the same as a condition to perform the duties which the
law has imposed. What are the statutory duties in respect
to the moneys coming into the treasurer's hands? They
are embodied in the following provisions: "The treas-
urer shall,

"First. Receive and keep all moneys of the Territory
(State), not expressly required by law to be received and
kept by some other person;

"Second. Pay all warrants duly and legally issued
by the auditor so long as there are in his hands funds suf-
ficient to pay such warrants ; Provided, that his payment
for any purpose shall in no case exceed the amount appro-
priated for such purpose;

"Third. Keep a just, true, and comprehensive account
of all moneys received and disbursed ;

"Fourth. Keep a just and true account of each head
of appropriation made by law, and the disbursements
made under the same ;

"Fifth. Render his accounts to the auditor for settle-
ment quarterly, or oftener if required ;

"Sixth. Report to each house of the legislative
assembly within ten days after the commencement of each
regular session, a detailed statement of the condition of
the treasury, and its operations for the two preceding
years." Rev. Stat., Sec. 1696.

The provision about rendering accounts to the auditor
is, perhaps, modified by the law, subsequently enacted,

providing for a State examiner, whose duty it is to examine the books of all financial officers.

" The territorial (State) treasurer shall in no case disburse or pay out the territorial (State) funds except on warrants drawn by the auditor." Rev. Stat., Sec. 1734.

" Biennially, at the end of their respective terms of office, the treasurer and auditor shall, upon the day above named (March 31), deliver to their successors all official books, papers, records, and balances of funds which may be in their possession ; Provided, That if either or both of such successors be not appointed, confirmed, and qualified, the existing incumbent of the office shall retain such territorial property until such appointment, confirmation, and qualification of his successor shall have taken place." Rev. Stat., Sec. 1731.

The section from which this last-quoted provision is taken was enacted while Wyoming was a Territory, as indeed, were all the laws above referred to, and when the treasurer and auditor were appointive officers, and served for a term of two years, which expired biennially on March 31. Under the constitution and laws of the State, they are elective officers, hold for a term of four years, which expires on the first Monday of January, instead of March 31. Therefore, so much only, if any, of the provision of Section 1731, with regard to delivery of books and funds to a successor, is in force which requires it to be done at the expiration of the official term.

The engagement of the defendants herein in and by the bond was that the treasurer should account, according to law, for all moneys coming into his hands. He was required to receive and keep all funds of the State not expressly required to be received and kept by some other person ; to pay out or disburse no State funds except upon auditor's warrants ; and at the expiration of his term of office, to deliver all balances of funds in his possession to his successor.

It is reasonably clear that the phrase " balances of funds in his possession " refers, applies to, and means,

all such funds which should, under the law, be in his possession. Such balances of funds as, having regard to his duties and responsibilities, he ought to have in his possession. Or, to put it, perhaps, more distinctly, all such funds which he has received, and has not lawfully paid out, or for which he is not entitled to any credit, legally or equitably, and for which he is bound in law to respond. Had there been a statute expressly exonerating the treasurer from all losses occurring without his fault, then under Section 1731, it is evident any funds so lost would not be legally regarded as in his possession, which he is thereby required to deliver to his successor. There is no such statute. Nevertheless, under all the decisions, as hereinbefore explained, he will be exonerated for such losses, or rather, he will not be liable for them, unless he and his sureties have positively contracted to become so. There is no express statutory requirement that the treasurer shall pay to his successor all the moneys belonging to his office, nor, that he will pay to him, or any other person, all the money which he shall have received. We are therefore obliged to resort to that provision concerning his duty to receive and keep the moneys of the State, to determine whether there has been an agreement to safely keep, or to securely preserve the public funds. It is manifest, that unless, by that provision, the statute has imposed upon the treasurer the absolute and unmistakable duty to keep safely the moneys, there is nothing elsewhere in the statute, or in the bond, which in any sense approaches an agreement to "safely keep" such moneys. The proposition that this case is within the principle of strict responsibility, and that the line of decisions adopting that rule should be accepted as precedents, or authority, assuming them to correctly announce the law, must stand or fall upon the construction of that provision of Section 1696, which says that, "The treasurer shall receive and keep all moneys of the State, not expressly required by law to be kept by some other person."

It is observable that the statute does not expressly state

that the treasurer shall keep "safely" the public funds. That word "safely" which has cut so important a figure in a majority of the cases is absent from our statute. Does the requirement that he shall receive and keep, mean, intrinsically, as used in the section the same as "keep safely"? Is the latter word mere surplusage? In what sense did the Legislature employ the word "keep" in respect to the public moneys? In answering these questions, it should not be forgotten that we are construing, not only a statute, but a contract, because only upon the contract can any liability in this action be maintained. Further than that, we are construing a contract which, it is contended, is absolute, so far as it goes, and not entitled to any equitable defense. A contract which if found to agree to "safely keep" the public moneys, renders the contractors insurers; a contract which, it is insisted, must be strictly enforced, although by doing so, a harsh rule is adopted and a distinction is made between the officer, and all other kinds of trustees.

The court has no sort of authority to make a contract between the State and these defendants. The contract, whatever it is, has already been made. The court has no right to impose upon the defendants any higher degree of responsibility than the Legislature has done, and by their bond, they have assumed.

If, by the intrinsic purport of the statute, the duty is not imposed upon the treasurer to keep safely the public funds, without exception, it would exceed the judicial prerogative to force such duty upon him. The duty of the court is merely to construe and interpret the statutes, not to make them.

The first specified duty of the treasurer is that he "shall receive and keep all moneys of the State not expressly required by law to be received and kept by some other person." In what sense is the duty to receive and keep thus prescribed? The last part of the provision which qualifies the first as to that which the treasurer is to

receive and keep; viz., that (money of the State) not
expressly required by law to be received and kept by some
other person, will not be understood by any one to com-
prehend only such money as is required to be kept safely
by some other person; but the idea clearly conveyed is
that the exception refers to State funds which belong in
the custody of other persons. This must indicate some-
what the sense of the entire sentence. It would be the
sheerest folly to attempt to supply the word "safely"
following and qualifying the word "kept."

Ought the court nevertheless to interpret the entire
provision as requiring the officer to keep safely the State
moneys so as to mean without exception and loss in any
manner?

The answer to that depends upon three considerations.
First, the sense in which the language respecting the
prescribed duty is employed in the provision. Second,
the susceptibility of the provision to any other reasonable
construction. Third, the significance of the word
"safely" if supplied or implied.

In regard to the matter first suggested. The provision
under discussion is the only one respecting the general
custody of State moneys. While stating a duty of the
officer, it describes that which he shall receive and keep.
Construing the entire sentence and giving due effect to all
its parts, and, in view of the significant absence of any-
thing therein to indicate the method or manner in which
the money shall be received or kept, it must be held to
have reference only to the custody of the money, and
that it has no greater force than if it had said that the
treasurer shall receive and have the custody and care
of all money of the State not expressly required to be
received and cared for by another person. The conclusion
that this is the correct interpretation of the statutory pro-
vision in question appears to me to be irresistible.

Take, however, the second matter suggested for consid-
eration. Is the provision susceptible of any other reason-
able construction than that it imposes upon the treasurer

the clear duty to keep the money safely? What has already been said in some degree furnishes an answer to this inquiry.

There is, however, a further answer. Several degrees of care to be bestowed upon property or money intrusted with a depositary are recognized in the law, only two of which we need to notice. First, that degree which is the highest known to the common law; viz., the exercise of diligence, fidelity, faithfulness, and such care as a prudent man would take of his own property or money. As to large amounts of public funds we might assume and hold that the care ought to be such as a very prudent man would exercise — a high degree of vigilance in addition to fidelity. Second, that the money shall be kept safely at all events and without loss, except probably that which may result from the act of God or the public enemy.

The degree of care first above mentioned is that which is always implied in the absence of a special contract as to money or property in the hands of a trustee. The responsibility of absolute safe keeping free from loss is never applied or enforced except when found to be specially contracted for. Take our statute. It requires the officer to keep certain moneys, without further specification. Is it susceptible of the construction that diligence and prudence are only intended as a measure of responsibility? Is it reasonably susceptible of any other? We can imply the less strict measure of liability, because such implication does no violation to any rule of law or interpretation. It is the implication which would arise if the statute had said that the treasurer shall have the custody of the money and nothing more. It adopts the measure of care and liability which would follow in the absence of a special contract differing therefrom.

To supply the word or imply the duty which some of the cases hold imports an absolute safe keeping without loss and a liability which admits of no defense of loss without fault or negligence, we must supply or imply that which has no place in the law outside of an express or

special agreement.   In that event it is necessary to say that the provision for keeping the money standing alone, means more than it meant at common law, and imports the very highest degree of· care and responsibility known to the law anywhere.

We are unable to conceive of any possible authority for going to that length.   In our judgment, the provision is not only reasonably susceptible of the more liberal interpretation, but it is not reasonably susceptible of any other.

The third point suggested for consideration is the significance of the word " safely " if it is to be supplied. The word not being found in the statute, and coming in only by way of implication from that which is expressed, the question arises, in what sense is it implied if at all. At common law the duty of a trustee with respect to money in his hands is more frequently than otherwise spoken of as to keep safely.   Yet when so used and spoken of it has no stronger force or meaning than that the money shall be kept and cared for with diligence and prudently, by the exercise of that degree of vigilance which has already been adverted to less than the ·requirement for absolute safety.

When we imply that word, or the duty represented thereby, as following or resulting from the express requirement of the statute, we must take it with its common law significance and interpretation.   We have no authority to interpolate it into the statute with any confined or strict meaning which it is held to possess when found in an express contract.   Again, in the absence of a bond to perform the duty the requirement to keep safely, although clearly expressed in the statute, would not impose the absolute responsibility upon the officer as an insurer.

We are convinced that the provision of the statute under discussion actually means that the treasurer shall receive and keep the money according to law.   There is no regulation of the manner in which, or the persons from whom, he shall receive the money in this particular

provision. To determine those matters we must resort to other portions of the statute or to implication. Neither is the manner nor method in which the officer shall keep the money regulated by this particular provision of the statute. To determine that matter also, we must find the regulation in other portions of the statute or resort to implication. Having undertaken the duty of keeping the money he must perform that duty according to law. The statute, however, nowhere else regulates that matter, nor the measure of his liability. Clearly, therefore, we are required to furnish the manner and the measure of the liability by implication upon well-known principles of law, inasmuch as the condition of the bond compels us to look elsewhere to determine its force and extent.

From either of the considerations above discussed, the conviction is forced upon us that the duty imposed upon the treasurer by statute and all reasonable implications therefrom was that he should have the custody of the money of the State and should exercise a diligent and prudent care over the money but in a high degree, and should also bring to the performance of such duty strict fidelity and faithfulness. And it therefore follows that by the bond neither the treasurer nor his sureties undertook any greater responsibility for the reason that they contracted that the treasurer should justly and truly account for the public moneys, which accounting we hold means according to law.

We have said that the statute does not regulate or prescribe the manner in which the money shall be kept. The constitution, indeed, contains some restrictions upon its use, and some commands upon the Legislature concerning money received from certain sources. It is provided by that instrument, that the making of profit, directly or indirectly, out of any public money, or using the same for any purpose not authorized by law, shall be deemed a felony, and be punished as provided by law. (Art. 15, Sec. 8.) The Legislature is required to pass laws "for the suitable keeping, transfer, and disbursement of

the land grant funds, and shall require of all officers charged with the same, or the safe keeping thereof, to give ample bonds for all moneys and funds received by them.'' (Art. 18, Sec. 4.) The Legislature has not required a separate bond for the land funds, nor enacted any law concerning the keeping thereof. Permanent land funds are authorized to be invested by the treasurer in certain kinds of securities. (L. 1890–91, p. 339, L. 1895, p. 125.)

It seems evident that all of these provisions fall short of prescribing the degree of care which shall be exercised by the officer.

Statutes, in subordination to their terms, are to be construed agreeably to the rules of the common law. U. S. v. Thomas, at p. 345; Bacon's Abridg., tit. Stat. 1, 4. It seems to me quite clear that it is not only possible to give to the statute the common law interpretation, but that in connection with the context, that is the sense in which the Legislature enacted it. That, if a more rigorous duty was designed to be imposed, other words would have been employed which would have plainly indicated it. In regard to a school district treasurer the statute provides that he shall have the custody of all moneys belonging to the district. Rev. Stat., Sec. 3959. It is, therefore, not an absurdity to suppose that the Legislature may have used such words only as shall require not absolute security to be afforded by a public treasurer, but the exercise of appropriate diligence and vigilance. If, to ''keep safely'' implies more than to keep diligently, honestly, and faithfully, then I ask, What right has the court to imply the higher and more onerous responsibility? The statute is certainly susceptible of the less harsh and burdensome construction. I have no doubt but that, in a sense, the treasurer is charged with the safe keeping of the moneys intrusted to his care. In the sense that he is to guard the same and exercise a high degree of vigilance to prevent its loss. Any trustee, an administrator, receiver, and guardian and public officer as to private mon-

eys is charged with the safe keeping of the funds in his control. He has the responsibility of their care. But the fact that one is charged with the safe keeping of money, does not imply that he is an insurer of its safety, and such a rule has at no time been promulgated. It is only where the party has positively contracted to safely preserve, that he is found to be an insurer.

I am aware that the learned judge delivering the opinion in the case of Thompson v. Trustees, 30 Ill., 101, said that the duty of the officer being to keep the money, it follows that he is to keep it safely. The court did not say that to keep meant to keep safely, but that the duty to keep safely followed the duty to keep, but I can not regard the statement as anything but mere dictum, for the reason that immediately preceding such remark the opinion quotes the statute which, in express terms, required the officer to "keep safely." This remark is adopted in the case of State v. Nevin, 19 Nev., 162, and applied to a statute of Nevada which did not even expressly require the treasurer to keep the moneys, but did provide that he should receive all moneys "due and accruing to his county, and disburse the same on the proper orders," etc. The Nevada statute further provided that, at the expiration of his office, the treasurer should deliver to his successor all public moneys in his possession, and that, at least once a year, the money in his office should be exhibited to the county board.

Unless the requirement as to the periodical exhibition of the money adds something to the other statutory provisions, and amounts to an unmistakable indication that the money is, by statute, required to be securely preserved, I should be inclined, with all due respect, to regard the Nevada case as going beyond the doctrine laid down by the leading cases announcing the theory of strict responsibility, and I should hesitate to follow it. I think that case, however, and most, if not all, of the cases enforcing the doctrine of strict liability can be clearly distinguished from the case at bar, owing to the difference

between the bonds or statutes; and eliminating the cases based upon a positive and clear condition in the bond, or requirement of statute, and considering the authorities which deny the strict liability in any case, there is not, upon a statute and bond like that here, a great weight of authority or preponderance of cases favoring the doctrine that the treasurer and his sureties are insurers of the safety of the public funds. The earlier cases have been referred to. A brief reference to some of the later ones will be useful.

In the New Jersey case, Inhabitants, etc., v. McEachron, supra, the statute prescribing the duties of a township collector was, "shall pay all moneys which he shall have received by virtue of any such assessment, to the county collector." The court said that "the condition of the bond read, as it must be read, in connection with the provision of the statute above quoted is of the purport that the collector will pay over the moneys received by him in his official character. The obligation to do this is unconditional, and there is no principle on which a qualification can be arbitrarily annexed to it."

In the case at bar, if the condition of the bond is not an unconditional obligation to keep safely all moneys received, and deliver to a successor all moneys not paid out on lawful warrants, there is, equally, no principle upon which such an obligation can be annexed to it.

In Minnesota, in the case of County of Hennepin v. Jones, supra, the statute expressly required the officer to "safely keep" all moneys coming into his hands. In the later case of Board v. Jewell, supra, no such express provision appears, but the court following the previous decision, held the officer liable, on the ground that according to the weight of authority, the principle of strict liability is enforced not only where the direct terms of a statute impose the duty to pay over all moneys received, but where such duty is to be gathered from its general tenor, and the duty was found in the general tenor of the statute. The Nebraska court adopts similar language;

its statement in Bush v. Johnson County, 48 Neb., 1, at p. 10, being "where the law, in positive terms, or from its general tenor, and without any limitation upon the obligation requires that the officer pay over public funds, which have been received by him and held as such." But, in that case, the bond itself was conditioned for the payment over of all the moneys of the county which the officer received. It is evident, therefore, that the reference to the principle as affected by the "general tenor of the statute" was unnecessary.

In the Texas case, Wilson v. Wichita Co., supra, the condition of the bond was that the treasurer would "safely keep" the school fund, etc. In the earlier Texas case of Bogg v. State, 46 Tex., 10, the bond is not given, but the language of the opinion indicates that it was conditioned for the payment over by a collector of all moneys received less his commissions.

The Kansas case does not quote the bond or statute, but the opinion states that the officer assumed the duty of safely keeping the public funds coming into his hands, and cites certain sections of the statutes. They required the officer to receive and take charge of all moneys belonging to the township, and pay out and account therefor upon orders drawn upon him by the township trustee. That much would not seem to go further than our own statute, but there was a penal statute also cited which subjected the officer to a fine, if he should neglect or refuse on demand after the expiration of his office, to deliver to his successor all moneys or other property appertaining to such office. This provision clearly distinguishes the Kansas case from the one at bar, and puts it in the class with the Colorado and Missouri cases where the statutes required all money belonging to the office to be paid over.

The Iowa case was founded upon a bond conditioned for a faithful performance of the duties of the office, and the statute required the officer to "hold" the money. It may be doubtful whether there is any distinction

between that case and the one at bar. If not, we are not prepared to yield our convictions upon the construction, which we believe the true one, to be placed upon a statute like our own.

In Washington the constitution provides that the Legislature shall provide for the strict accountability of county officers for all public moneys which may officially come into their possession. And in Fairchild v. Hedges, supra, the bond required by statute, which seems to have been construed in the light of the constitutional provision, was conditioned that "all moneys received by him (the officer) for the use of the county shall be paid as the commissioners shall from time to time direct," and "for the faithful discharge of his duties." In that case Mr. Chief Justice Hoyt dissented, saying, that it was a strained construction of the statute and obligation which made the officer the guarantor of the safe keeping of the public moneys.

All of the cases adopting the strict doctrine do so upon the terms of the bond or statute, and distinguishing them according to the principle or reasons behind the respective decisions, or the various terms or provisions of the statute, none of them, with the possible exception of the cases from Iowa and Washington, and the later Minnesota case, can be said to have found the strict contract in a bond and statute at all similar to that in the case at bar.

The cases in which the general proposition has been determined, one way or the other, involve losses occurring in various ways. In some of them the money has been lost by larceny, robbery, or burglary, and in others through the insolvency of a bank in which it had been deposited. No distinction upon principle between the various causes of loss, in the absence of negligence, has been made in the adjudicated cases.

If the bond according to its own terms does not require that the money be kept safely, or that all that has been received, or all belonging to the office, shall be paid over, without exception, the extent of its obligation may be con-

trolled by the statute.    But to authorize the application of the strict rule, the obligation must be certain, positive, and clear, and made express by the direct terms of the bond, or statute read in connection with it.    If nothing appeared in the statute prescribing the officer's duties, the courts would imply that he was to keep the money safely, and to pay or deliver to his successor all the balance of money in his hands.    As so implied, however, the engagement or duty would not be absolute, and a defense of loss without fault would be permissible.

To say, as was said in Illinois, in Thompson v. Trustees, supra, that the duty of the officer being to keep the money, it follows that he is to keep it safely, is nothing more or less than implying the duty to keep safely.    This may be allowable for certain purposes, but not for the purpose of making an express and absolute statute or contract. When we enter the field of implied duties, we must respect the law thereof.    When the duty to keep safely is implied and not expressed, its meaning and effect is determined as at common law ; and at common law that requirement meant only to keep diligently and prudently.

We are unable to give our consent to reading into the statute the very words, or language, or provision, omitted therefrom, which will render applicable, and the only thing which will render applicable the harsh rule which is not found elsewhere respecting depositaries of money.

No liability can be predicated upon the theory that the treasurer is a debtor for the money in his hands.    Our statutes proceed upon a different idea altogether, and this court in State v. Foster, assignee, etc., 5 Wyo., 199, held that the State and county treasurers are but custodians of the public funds committed into their hands.    Neither can it be said that the deposit of the public funds in a bank is an unlawful act, and constitutes the treasurer a debtor. The admitted facts show that for many years the custom has been for custodians of the public funds to deposit them. in banks for safe keeping, and that no other safe place has been provided.    The Legislature has known of this cus-

tom, as well as the people generally, and it would be going very far, at this late day, to hold such an act unlawful.

Further than that, the constitution contains a provision recognizing banks, at least national and State banks, as proper places for deposit of public funds. , It provides that all public money shall, whenever practicable, be deposited in a national bank, or bank incorporated under the laws of this State ; provided that the said bank shall furnish security to be approved as provided by law, and shall also pay a reasonable rate of interest, which interest shall accrue to the fund from which it is derived. Const. Art. XV, Sec. 7. That section is inoperative, however, as the Legislature has not provided by law for the approval of the security, nor enacted any law for carrying the provisions of the section into effect.

The fact that the funds in Treasurer Gramm's hands were deposited in a private bank can not, in my judgment, affect our determination. ˙None of the·cases on either side of the question make any distinction between a deposit of public moneys in corporate and private banking institutions. In some of the cases, and in many of those involving the liability of other kinds of trustees, the money was in private banks. The relation of banker and depositor, and of the banker to the fund, is the same whether the bank is private or corporate. One can not fail to recognize the fact that when the deposit is in a private bank, the moneys are placed in the possession of an individual who has given no security to the State, and that it is in his power, if so disposed, by illy advised transactions to hazard the safety of the money. To a certain extent the same power exists as to a corporate bank, national or State. The extent of their business dealings may be limited; they may not be authorized to use the money of depositors in outside speculations or investments not strictly connected with the banking business. They may, however, actually do what they are not authorized to do. Moreover, they may by bad loans, lose the money left

with them on deposit just as completely as if it had been thrown into unwarranted business enterprises. On the other hand, while as to a corporate bank, the responsibility behind the corporate assets is usually limited; all the property of a private banker is behind his institution. In the case at bar, it is alleged and admitted that, at the time of the assignment of Mr. Kent, he had sufficient property to pay his debts, but that that result became impossible by reason of subsequent depreciation in values.

After all, however, as between different kinds of banks, the question is one of diligence, faithfulness, and care. If it was negligence in the officer to deposit the public funds in a private bank, that question is eliminated from this case, because it is alleged and admitted that it was not negligence. It can not be said to be negligence per se, or as a matter of law for any trustee to place the funds in his control in a private bank. In no kind of case has such a doctrine been asserted. Whatever the facts are, we are not to determine them. They are before us admitted by the pleadings and stated in the questions. Our duty is only to determine the law as applicable to them.

Although it is not necessary that we decide the question of estoppel presented in argument were the defendants liable, we do not think the fact that the State brought suit to trace the funds into the hands of the assignee of the banker having them on deposit, nor the acceptance of dividends from the estate of said banker, would affect the question, or constitute an estoppel against the State from pursuing the treasurer upon his bond. The money belonged to the State, and no efforts of the State to recover it from other hands could possibly affect whatever the liability of the treasurer might be for the unrecovered balance. We understand, however, that it is not even contended by counsel that suit to trace and recover the funds operates as an estoppel; but it was urged that the acceptance of dividends from the assigned estate upon a claim filed by the State, in pursuance of a resolution by the Legislature does have that effect. We do not think

so. The assignor had in his hands money belonging to the State, and he was accountable therefor, and is still accountable therefor; but any liability of the treasurer was not thereby released. These views are supported by Nason v. Directors, 126 Pa. St., 445; Rose v. Douglas Twp., 52 Kan., 451.

The defendants did not enter into a bond which contains a condition that the treasurer would keep safely the moneys of the State in his hands, so that he would be liable absolutely in case they were lost, without any fault or negligence on his part. The questions reserved for our decision are based upon the facts admitted by the pleadings that there was no fault or want of care or diligence on the part of the treasurer, and that he is not chargeable with any fraud or negligence or unfaithfulness in any degree.

We answer the first, second, and third questions in the negative. The fourth question which pertains to what judgment should be rendered is not necessary or proper under our former decisions to be answered.

KNIGHT, J., concurs.

CORN, JUSTICE (dissenting).

I do not concur in the conclusion reached by a majority of the court.

In cases like the present, under slightly varying statutes, the courts of the United States and the courts of, perhaps, twenty of the States have held such officers and their sureties to a strict responsibility for the public funds. And in my opinion not only the greater number but the great weight of authority sustains that view. A few of the State courts have held otherwise.

The suit is upon the bond — the contract between the State and the defendants. Any recovery must be upon this contract. It is an express contract in writing. So far as the sureties are concerned it is evident that prior to the execution of the bond they had no responsibility in the premises whatever, and that their liability now is only

what they have assumed by their contract. A few courts holding the minority view, as in Cumberland v. Pennell, 69 Me., 357, have reached the conclusion that the responsibility of the defendants is governed by what is termed the "law of bailments," and that the treasurer is a bailee for hire, and is bound only to bring to the discharge of his trust "that prudence, caution, and attention which careful men usually exercise in the management of their own affairs, and he is not responsible for any loss occurring without any fault on his part." It is to be observed that the law of bailments here invoked which fixes the liability of a bailee for hire is simply the contract implied by law between the parties when they themselves have made no express contract fixing the degree of responsibility of the bailee. Commonwealth v. Comly, 3 Pa. St., 372. It has no application where the parties themselves have made their own contract. And, indeed, it is not applied alike in all cases of bailment for hire where there is no express contract, as in the case of common carriers and inn-keepers the contract implied by law is for a more stringent liability, owing to the relations of the parties.

In this case the treasurer and his sureties have contracted in the words of the bond that he shall "faithfully and truly perform all the duties of his office." Those duties are prescribed by the statutes of this State. Section 1696 provides that "the treasurer shall; first, receive and keep all moneys of the State, not expressly required by law to be received and kept by some other person; second, pay all warrants duly and legally issued by the auditor so long as there are in his hands funds sufficient to pay such warrants."

Section 1734 provides, "The State treasurer shall in no case disburse or pay out the State funds except on warrants drawn by the auditor." Section 1731 provides that at the end of their respective terms of office the treasurer and auditor shall "deliver to their successors all official books, papers, records, and balances of funds which may be in their possession." These are his duties

with reference to the public funds, and he and his sureties have contracted that he shall faithfully and truly perform them.

It is clear that the plaintiff must recover under this state of facts unless it is held, either that they do not show a contract for the safe keeping of the money, or else, that the loss of the funds by the failure of the bank in which they were deposited is an equitable excuse for the non-performance of the contract.

The duty prescribed by the statute is that he shall "receive and keep" the funds. But some stress is laid upon the circumstance that while some statutes, under which the treasurer has been held to a strict liability, provide that he shall "safely keep," the word safely is omitted from ours, and it is argued that the latter indicates the requirement of a smaller degree of responsibility. And I understand that this is the view adopted by my associates, and that upon this distinction they rest the decision of this case. That is, that by the use of the words to receive and keep, omitting any such additional words as "safely," "securely," or the like, the officer is simply made the custodian of the funds, and that his bond to faithfully perform the duties of his office is not an unconditional contract to safely keep the funds. Where the custody of other property than money is involved, there might, no doubt, be a distinction between keeping and keeping safely, that is, keeping uninjured; and it is easy to perceive that such property might be kept and turned over, but in such condition as to show negligence in complying with the requirement to keep safely. But in the case of money, if it is kept at all, and is forthcoming when required, it is kept safely; and there is no issue in this case which makes such a distinction important or relevant. If the defendant had kept the money and turned it over, there could be no complaint that he had not safely kept it. In Illinois, in a suit upon the bond of a township treasurer, the defense was interposed that the money was stolen without the fault of the defendant.

The condition of the bond was that the treasurer " shall faithfully discharge all the duties of said office according to the laws which are or may hereafter be in force, and shall deliver to his successor in office all moneys, books, papers, securities, and property in his hands as such township treasurer, then the obligation to be void, etc." By Section 56 of the statute he was required among other things to charge himself with all moneys received. By Section 62, he was required "to demand, receive, and safely keep, according to law, all moneys, etc." The bond in this case being conditioned only for the performance of his duties and the turning over of the moneys "in his hands," and the sixty-second section providing only for a safe keeping "according to law," it was urged by counsel that the duties of township treasurer did not embrace keeping safely the moneys coming to his hands. The court say, "The fact that the township treasurer is required to receive money, and enter it in his cash book, implies without any other special regulation, that he is to keep it, and being required to keep it, it follows that he is to keep it safely. This is one of the duties of his office he has undertaken to faithfully discharge. Another duty, no less imperative, is that he will deliver to his successor in office all moneys in his hands as such township treasurer, which he could not do, if he suffered it to be lost out of his hands, or it should be so lost by any accident. The undertaking is that the money shall be in his hands. These duties he has undertaken to perform unconditionally. Besides all this, he is required by Section 62 to receive and safely keep, according to law, all moneys, etc., belonging to the township."

"We can not discover a shade of difference between this and the case of United States v. Prescott, 3 How., 578, cited by the counsel for the defendant in error. As in that case so here is an undertaking safely to keep the money by the very force of the language of the condition of the bond, independent of the provisions of the sixty-second section." Thompson v. Board of Trustees, 30

Ill., 99. In State v. Neven, 19 Nev., 294, 7 Pac., 650, the condition of the bond was to "well and truly and faithfully perform and execute the duties of treasurer." The provision of the statutes was that the county treasurer "shall receive all moneys due and accruing to his county and disburse the same on the proper orders issued and attested by the county auditor. He shall so arrange and keep his books that the amount received and paid out shall be exhibited in separate accounts, etc. He shall at all times keep his books and office subject to the inspection and examination of the board of county commissioners, and shall exhibit the money in his office to such board at least once a year, etc. He shall annually make complete settlements, * * * and at the expiration of his term of office deliver to his successor all public moneys, books, and papers in his possession."

The defendant insisted that his responsibility was simply that which the common law imposes upon a bailee for hire. The court say the duty to safely keep the money is made absolutely clear by the provisions of the statute referred to.

In Tillinghast v. Merrill, 151 N. Y., 135, decided December 1, 1896, one of the latest cases upon this subject, the statute is quoted as follows: "It is the duty of every supervisor,

"1. To disburse the school moneys in his hands applicable to the payment of teachers' wages upon and only upon the written orders of a sole trustee, or a majority of the trustees, in favor of qualified teachers.

"2. By paragraph 8 of the same section a supervisor is required to pay to his successor all school moneys remaining in his hands."

The court say: "In this statute it will be observed that there are no explicit declarations of the legislative intent, as in the case of town collectors, to create a supervisor the debtor of the county for public moneys in his hands, and the condition of the bond to safely keep, faithfully disburse, and justly account for the same does not

add to the liability created by statute." Upon the decision of the same case in the supreme court of New York, Martin, Justice, dissented upon the specific ground that the condition of the bond to "safely keep," etc., imposed upon the officer no greater responsibility or liability than the statute. 77 Hun., 489. In Iowa township treasurers are required by the statute to give bond "conditioned for the faithful performance of their duties." The same act makes it the duty of the treasurer to hold all moneys belonging to the district, and pay out the same upon the order of the president, countersigned by the secretary. The court say: "The condition of the bond upon which this action is brought substantially complies with the requirements of the statute; it is in effect identical with the condition prescribed in the law. It is made his duty to hold all moneys of the district, and to pay them out only upon vouchers signed by the proper officers. He is bound by the obligation of the bond, not to exercise due care and diligence in the discharge of this duty, but to perform it absolutely, without conditions or exceptions. He is to hold the money of the district. This is the provision of the law. His contract, expressed in the bond, binds him to the discharge of this duty. He will not be relieved from his contract by showing any degree of diligence or care which falls short of absolute compliance with the terms of his contract." Dist. Township of Taylor v. Morton, 37 Iowa, 553.

The court did not recognize the nice distinction relied upon in the majority opinion in this case, that to "hold safely" might be construed as a contract to hold without loss, while the obligation to "hold" is to be shaded down into a contract to use due care and diligence in holding. But it pointedly rejects such interpretation of the requirement to hold the money, although, as in our own statute, the word is entirely unqualified by safely, securely, or any word of like import.

In Kansas the statute requires a township treasurer to give bond "conditioned for the faithful discharge of his

duties." The section prescribing his duties provides:
"The township treasurer shall receive and take charge of
all moneys belonging to the township, or which are by
law required to be paid to him, and shall pay out and
account for the same upon orders drawn upon him by the
township trustee, and shall discharge such other duties as
may be required of him by law." Under this statute the
court say: "By accepting the office of township treas-
urer, Mc Nabb assumed the duty of receiving and safely
keeping the money of the township, and paying it out
according to law. He or his sureties are bound to make
good any deficiency which might occur in the funds which
came under his charge, whether they were lost in the bank
or otherwise." Rose v. Douglas Township, 52 Kan.,
452. (34 Pac., 1046.) Here there was no express
requirement that the officer should "safely keep," or
even, as in our statute, that he should "keep" the funds;
but simply that he should "receive and take charge of
them." But it is unnecessary to multiply authorities.
While there are several cases wherein the statute or the
bond sued on employed the expression "safely keep," or
"keep safely," there is, as I believe, no reported case
sustaining the distinction which seems to be relied upon
by the majority of the court for the decision of this case.
This view has been frequently insisted upon by counsel,
but so far as the cases have come to my knowledge, has
in every instance been rejected by the courts.

The majority of the court having reached the conclu-
sion that no contract has been shown binding the treas-
urer to keep safely or securely the moneys of the State,
declined to express an opinion upon the question what
measure of liability such contract imposes when proven.
In my view, the bond and the statute clearly, and under
all the authorities, constituting such a contract, there is
no other question for this court to decide than the charac-
ter of liability which it imposes.

It has been held by the Supreme Court of the United
States, and by the highest courts of perhaps twenty of the

States, that where, in whatever form of words, the bond is conditioned for the payment over of the public moneys, or for the keeping or safe keeping of them, or the statute prescribes such, in substance, to be the duty of the officer, and the bond is conditioned for the performance of the duties of the office, and no condition limiting that obligation is discoverable in the statute, the obligation thus imposed upon and assumed by the officer will be deemed absolute, and the plea that the money has been stolen, or lost without his fault, does not constitute a defense to an action for its recovery; that the contract being absolute in its terms, there is no defense at law but a production of the funds, and that loss by accident or otherwise is not a defense in equity, but the allowance of such a defense would be dangerous to the public interests, and is forbidden by considerations of public policy. This is substantially the view adopted in U. S. v. Prescott, 3 How, 578; U. S. v. Dashiel, 4 Wall., 182; U. S. v. Keehler, 9 Wall., 83; Boyden v. U. S., 13 Wall., 17; Bevans v. U. S., 13 Wall., 56; New Providence v. Mc Eachron, 33 N. J. L., 339; Inhabitants of Hancock v. Hazzard, 12 Cush. (Mass.), 112; Thompson v. Board of Trustees, 30 Ill., 99; State v. Chaft, 24 Ark., 550; State v. Harper, 6 O. St., 607; Com. v. Comly, 3 Pa. St., 372; Halbert v. State, 22 Ind., 125; Gartley v. The People (Colo.), 49 Pac., 272; Rose v. Douglas Township, 52 Kan., 452 (34 Pac., 1046); Bush v. Johnson County, 48 Neb., 3; State v. Nevin, 19 Nev., 162 (7 Pac., 650); State ex rel. Mississippi Co. v. Moore, 74 Mo., 413; Dist. Township v. Morton, 37 Iowa, 550; Board of Education v. Jewell, 44 Minn., 420; Tillinghast v. Merrill, 151 N. Y., 135; Fairchild v. Hedges (Wash.), 44 Pac., 125; Wilson v. Wichita County, 67 Tex., 647 (4 S. W., 68); Griffin v. Board of Commissioners (Miss.), 15 Southern, 107; U. S. v. Watts, 1 New Mex., 562; Omro Suprs. v. Kaime, 39 Wis., 468.

There are many other cases announcing substantially the same principles. There are some of those above

referred to which hold that the statute has made the officer the legal owner of the public funds committed to his keeping, and for that reason they are, by the majority of this court, discarded and set aside as of no authority under our laws which do not vest the legal title to the public funds in the treasurer.    I confess myself unable to understand why this feature should make those decisions of no authority in this case.    If it is upon the theory that the officer is held to be a mere borrower of the public funds for his own use and benefit, and to be held to repayment as upon a promissory note. like any other borrower of money, it is sufficient to say that no court has ever hinted at any such ownership in the officer.    They have held simply that the technical legal title by the statute vested in the officer.    If it is because of some legal or equitable principle that while courts of chancery will relieve against the enforcement of unconscionable contracts to refund moneys which do not and never did belong to the defendant, they will not relieve against unconscionable contracts to pay out one's own money to make good the losses of another, it is sufficient to say that no such principle exists.    In the case of ordinary trustees, the legal title is in the trustee.    Almost without exception in the United States the legal title to the money and personal property of the decedent vests in the executor or administrator.    But in these cases courts of equity will, and constantly do, relieve from liability arising out of bonds absolute in their terms.    It is therefore clearly not for the reason that the statutes have vested in the officer the legal title to the public funds that these cases hold him to a strict liability.    But the fact of such technical legal title has been emphasized in those cases to make it clear that, the officer not being a bailee, the law of bailments did not govern, and these cases have then been determined by reference to the express contract as in U. S. v. Prescott, and the other cases taking the same view.    This is made perfectly evident by the opinion in Inhabitants v. Hazzard, 12 Cush., 112.    The complete

opinion is as follows: "A collector of taxes, by accepting the office, takes the risk of the safe keeping of the money he has actually received. His obligation is not regulated by the law of bailments, and the cases cited to that effect are inapplicable. He is a debtor, an accountant bound to account for and pay over the money he has collected. The loss of his money, therefore, by theft or otherwise, is no excuse for non-performance; this is founded on the nature of his contract and considerations of public policy. United States v. Prescott, 3 How., 578. "It being the duty of the collector to account for and pay over to the treasurer, and the excuse of loss by theft being unavailing, the sureties in the bond are liable equally with the principal."

The tenor of all the cases holding the officer and his sureties to a strict liability is that the contract is absolute, neither the bond nor the statute providing any excuse for non-performance; that at law, it can only be discharged by performance; that therefore any excuse for non-performance must be an equitable one; that the excuse of loss of the funds, unless by the act of God or the public enemy, will not be allowed in equity, because it would be dangerous to the public interests and contrary to public policy. None of the cases, as I understand them, attempt upon ground of public policy or otherwise, to impose any liability upon the officer and his sureties other than that voluntarily assumed by them by their contract. There seems to be, however, some confusion or misconception upon this point, in some, at least, of the few courts dissenting from the prevailing doctrine. In City of Healdsburg v. Mulligan (Cal.), 45 Pac., 337, the court in concluding its discussion of the question of the application of the principles of public policy says: "Justice does not require that the public shall be protected by enforcing against its servant, the officer and his sureties, a liability the law has not imposed upon him and which they have not assumed." This language would seem very clearly to impute to the majority of the courts of the

country a doctrine which is certainly not stated in their decisions, and would probably be very vigorously repudiated by all of them. Six courts, as I understand, are quoted as sustaining the minority view. Maine, in Cumberland v. Pennell; Alabama, in State v. Houston; Tennessee, in Peck v. James, and State v. Copeland; South Carolina, in York County v. Watson; California, in City of Healdsburg v. Mulligan; and Montana, in Livingston v. Woods. The Maine decision is the leading case, and out of a court composed of seven judges, the chief justice and two of the justices dissented. There seems to be in all of the decisions to which we have had access or been referred, but five in which the failure of a bank has been held to be a sufficient excuse for failure to pay over the moneys. Of these, in Peck v. James, 3 Head (Tenn.), 75, a school trustee had accepted bank notes of the Bank of East Tennessee, at that time supposed to be solvent, but which failed while its notes were in his hands. He tendered the specific bank notes to his successor in settlement. In City of Livingston v. Woods (Mont.), 49 Pac., 437, the suit was against a city treasurer, and both the law of the State and the ordinance of the city required the officer to deposit the money. In State v. Houston, 78 Ala., 581, the defense of robbery was set up, and the court held that while the responsibility of the officer under the statute fell short of an absolute liability, it was greater than that of an ordinary bailee for hire, the officer being held to the highest diligence. And the court say: "We purposely limit the decision to the case of irresistible force."

The great mass of cases referred to involving the liability of trustees of private property, executors, administrators, guardians, and the like, afford no parallel whatever, and are valueless as authority. Such officers are in a great measure mere private agents. They must handle and manage the estates in their hands, often exercise their judgment and discretion, and incur the risk of loss of the trust property. If their bonds import con-

tracts for absolute liability, courts of equity will neverthe-less treat them as agents, and relieve from any greater liability.    Probate courts and those of like jurisdiction are amply endowed with equity powers to afford proper relief.    These matters are too well understood to require any extended comment.

In regard to the principle of public policy underlying the decisions, there is in my mind no question whatever of the propriety and necessity of its enforcement.

While Alabama is quoted as one of the States sustain-ing the limited liability, there is the later case from that State of Alston v. State, 92 Ala., 126, which is strongly persuasive of the other view, and somewhat applicable to the conditions under our laws.    A judge of probate was sued for public moneys, and pleaded that he had deposited them in a certain bank which had failed, and there were the usual stipulations of perfect solvency at the time of the deposit, etc.    By the statute he was prohibited from knowingly converting or applying any of the money to his own use, or to the use of any other person, or permit-ting another to use any of it.    Applying this statute the court say: "The money of the State was thus turned over to the bank on general deposit, and became part of its funds and subject to its use as any other of its property. This use of the public money by the probate judge was without warrant of law.    He had no right to convert it to his own use or permit any one else to use it.    The deposit was of like effect as a loan of the money.    It was an unauthorized use thereof.    The probate judge by that act voluntarily relinquished his custody and control of this public fund so that he could not reclaim it.    When the State demands it, his answer is that he no longer has it, but has a claim for the amount thereof against an insolv-ent bank.    In view of the statutory provisions above referred to we think this answer is wholly insufficient as a defense."

So under our laws the banker becomes the owner of the money and at liberty to use it for investment, speculation,

or otherwise. The officer is forbidden by the constitution to use for his own benefit, or make any profit from the public moneys, and he must give a heavy bond for their safe keeping. But of what use or benefit to the people is a bond, if he may immediately turn over the public funds to some other person who may and does and is expected to use them for his own purposes; and that, too, without any security whatever? The bond is a meaningless form if it is not to secure to the State repayment of its losses under such circumstances.